AE

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| LIADENNA DAVIS, as Special Administrator of the ESTATE OF CARLTON CLARK, <br><br> Plaintiff, <br><br> v. <br><br> VILLAGE OF FOX LAKE, a municipal corporation; and VILLAGE OF FOX LAKE POLICE OFFICERS WILLIAM GOLDEN, WILLIAM MONKSEN, RAYMOND BARTOSZEWSKI and TERRANCE DALY, <br><br> Defendants. | No. 03 C 8324 <br><br> Judge John W. Darrah |

## MEMORANDUM OPINION AND ORDER

The deceased, Carlton Clark, allegedly died as the result of his encounter with Village of Fox Lake police officers when a pre-existing pulmonary aneurysm ruptured while he was being questioned by Officer William Golden. The Plaintiff, Liadenna Davis, as Special Administrator of the Estate of Carlton Clark ("Plaintiff"), filed a four-count complaint. Count I is a claim under 42 U.S.C. § 1983 against the Village of Fox Lake Police Officers William Golden, William Monksen, Raymond Bartoszewski, and Terrance Daly (collectively, the "individual Defendants") based on alleged Fourth Amendment violations. Count II is a claim for damages under 42 U.S.C. § 1983 under the Fourteenth Amendment, alleging deliberate indifference in providing medical care. Counts III and IV are pendant state law claims for wrongful death and a survival tort claim, respectively, against the individual Defendants and the Village of Fox Lake ("the Village").

Presently before the Court is Defendants' Motion for Summary Judgment.

## LEGAL STANDARD

Summary judgment is proper if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact." Fed R. Civ. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-323 (1986) (*Celotex*). All of the evidence and the reasonable inferences that may be drawn from the evidence are viewed in the light most favorable to the nonmovant. *Miller v. American Family Mutual Ins.*, 203 F.3d 997, 1003 (7th Cir. 2000). Summary judgment may be granted when no "reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (*Anderson*). However, a party cannot defeat summary judgment by relying on unsubstantiated facts. *See Greer v. Board of Educ. of the City of Chicago*, 267 F.3d 723, 729 (7th Cir. 2001) (*Greer*).

## BACKGROUND

The undisputed facts, for the purposes of this motion, are taken from the parties' Local Rule 56.1(a) & (b) statements of material facts (referred to herein as "Pl.'s 56.1"; "Defs.' 56.1"). The Defendants responded to only one of Plaintiff's statements of additional material fact; and therefore, in accordance with Rule 56.1, all of the facts to which the Defendants did not respond are deemed admitted. *See* Rule 56.1. In further deviance from Rule 56.1, the Defendants included in their "Rule 56.1 Statement in Support of Their Motion for Summary Judgment" several sections: (1) Allegations of Complaint, (2) Undisputed Facts, and (3) Rovaun Manuel's Version of the Encounter. These sections contained different versions of the events, some of which are internally inconsistent. Where there are inconsistencies between the Plaintiff's version

and the Defendants' version or within the different sections submitted by the Defendants, these facts are deemed disputed.

On August 14, 2003, Golden, Monksen, Bartoszewski, and Daly were on duty as police officers for the Village of Fox Lake, working a "special detail" at a restaurant, Famous Freddie's. (Defs.' 56.1 ¶ 13, Pl.'s 56.1 ¶ 2). There was an earlier incident at this restaurant some weeks prior to August 14, 2003, that involved the mention of several gangs. (Defs.' 56.1 ¶ 16). No arrests were made, and there was no determination that any crime occurred. (Pl.'s 56.1 ¶ 3).

At approximately 11:30 p.m. on August 14, 2003, Officers Golden and Monksen, who were in the same police car, encountered a car being driven by the deceased, Clark, in which Rovaun Manuel, a friend of Clark, was a passenger. (Defs.' 56.1 ¶¶ 18, 46). The parking lot at Famous Freddie's was full so Clark's vehicle exited the parking lot to find parking. (Defs.' 56.1 ¶ 47). At some point, Clark's vehicle was stopped in traffic at the front of the parking lot to Famous Freddie's; and Officer Golden's vehicle approached. (Defs.' 56.1 ¶ 22).

When Clark's vehicle was in front of Officer Golden's vehicle, Officer Monksen used the mobile data terminal ("MDT") to run a license plate check, a normal practice when on patrol. (Defs.' 56.1 ¶¶ 23-24). At the time the vehicle was stopped, Officers Golden and Monksen could not see the occupants of Clark's vehicle; and there had not been any motor vehicle code violations noted. (Defs.' 56.1 ¶ 25). From the license plate check, the officer obtained the name of the owner of the vehicle (it was Clark) then ran another computer query, referred to as "SOUNDEX" on Clark's driver's license number; and he received a "gang hit," indicating that Clark was reported to be involved with gang activities and possibly a member of the Gangster Disciples ("GD"). (Defs.' 56.1 ¶¶ 26, 28; Pl.'s Resp. to Defs.' 56.1 ¶ 28).

3

Attached to the computer information was a statement that informed officers not to use the "gang hit" information as the basis to stop, search, detain, or arrest the individual at issue. (Pl.'s Resp. to Defs.' 56.1 ¶ 30). Prior to the encounter, the individual Defendant police officers had no information that Clark, or the others who were with him when he was later stopped by the police officers, had been involved in any previous incidents at or around Famous Freddie's or that they were involved in any criminal activity. (Pl.'s 56.1 ¶ 4).

Clark parked the vehicle he was driving in a satellite parking lot. (Defs.' 56.1 ¶ 50). Clark and his companion, Manuel, met some of Clark's friends in the parking lot; and all of these individuals walked out of the parking lot together. (Defs.' 56.1 ¶ 37). Officer Golden pulled his vehicle over and exited his vehicle. (Defs.' 56.1 ¶¶ 38-39). Officers Bartoszewski and Daly received radio notice from Officers Golden and Monksen of their encounter with the young men; however, no audio or transcript of that transmission has been produced. (Pl.'s 56.1 ¶ 7). At some later point, Officers Bartoszewski and Daly arrived at the scene. (Defs.' 56.1 ¶ 89).

When the group was about even with the police vehicle, Officer Golden called out to them. (Defs.' 56.1 ¶ 55). Officer Golden stopped the group and asked, "Which one was driving the white car?" (Defs.' 56.1 ¶¶ 55, 58). Upon initial questioning, the young men were looking at each other as if confused by the questioning. (Pl.'s 56.1 ¶ 11). Manuel described the tone of Officer Golden's voice as a "raised, intimidating voice." (Defs.' 56.1 ¶ 56). When Officer Golden asked who was driving and did not receive any reply, the Officer again asked, "Which one of you assholes is driving the car?". (Defs.' 56.1 ¶ 57). After this second question, Clark stepped up and said he was driving the vehicle. (Defs.' 56.1 ¶ 59). Clark did not resist the officer's instructions and orders. (Pl.'s 56.1 ¶ 12).

After Clark stated that he was the driver, Officer Golden asked Clark if he was in a gang. (Defs.' 56.1 ¶ 61). When Officer Golden asked that question, a couple of the men in the group laughed; and Officer Golden then said words to the effect of "you think it's funny, when I ran the plate and that it came back as Gangster Disciples." (Defs.' 56.1 ¶ 62). In response to the officer's statement, someone in the group said that Clark was not in a gang and that he was sick. (Defs.' 56.1 ¶ 63). About this time, a prisoner transport van, or police van, pulled up. (Defs.' 56.1 ¶ 64). When driving toward the group, the oscillating front and tail emergency lights of the van were illuminated. (Pl.'s 56.1 ¶ 9). After stopping, the headlights and a spotlight atop the van were illuminated and directed in the direction of the young men being questioned by the officers. (Pl.'s 56.1 ¶ 9).

Soon thereafter, Officer Golden told Clark to come over, and Clark walked over to him. (Defs.' 56.1 ¶ 65). The Officer separated Clark from the other young men and addressed him in a manner that made it clear that he was not free to go. (Pl.'s 56.1 ¶ 13[1]) Officer Golden told the young men that he wanted to talk to Clark and "then you can go upon your way." (Pl.'s 56.1 ¶ 14). Manuel believes that Officer Golden then grabbed Clark by the arm and took him to the front passenger side of the police van. (Defs.' 56.1 ¶ 95; Pl.'s 56.1 ¶ 15). At the time, Clark was standing approximately two feet from the police van, with his back to the van. (Defs.' 56.1 ¶ 67). Officer Golden was standing about six inches from him, and Clark began to experience what appeared to be a nervous cough. (Defs.' 56.1 ¶ 76; Pl.'s 56.1 ¶ 16). Manuel approached when he heard Clark coughing. (Pl.'s 56.1 ¶ 16).

---

[1] This was not disputed by the Defendants in response to the Plaintiff's 56.1 statement of material facts, although they argue a position to the contrary to this in their briefs.

5

Officer Golden said something to Clark about the coughing being related to Clark's trying to swallow drugs. (Pl.'s 56.1 ¶ 16). When the Officer was told that Clark did not swallow drugs but that he had a heart and lung condition and that Officer Golden should call an ambulance, the Officer responded, "That's what he gets." (Pl.'s 56.1 ¶ 78).

At about this time, Clark then began to cough and throw-up a lot of blood. (Pl.'s 56.1 ¶ 21). When this occurred, Manuel tried to approach Clark and comfort him; but he was rebuffed by the officers. (Pl.'s 56.1 ¶ 21). Clark continued coughing and doubled over; Officer Golden pushed him up against the van. (Defs.' 56.1 ¶ 70 and Pl.'s 56.1 ¶ 16).

Soon thereafter, Officer Golden made the comment, "He ain't sick, he tried to swallow drugs." Manuel said that Clark had a heart and lung condition and that it was serious. (Defs.' 56.1 ¶ 80). The Plaintiff's expert, James Bryant, M.D., a pathologist who performed a second-look autopsy and reviewed the initial autopsy and toxicology reports, confirmed that Clark had not swallowed anything. (Pl.'s 56.1 ¶ 23).

Another officer said that they should call the paramedics, and that it did not look good. (Defs.' 56.1 ¶ 80). When the ambulance arrived, Clark said, "Rovaun [Manuel], don't leave me; I'm scared; drive with me; get in with the paramedics." (Pl.'s 56.1 ¶ 22).

Clark later died from his injuries. According to the Plaintiff's expert, Dr. Bryant, the stress of the "confrontation" caused an increase in blood pressure, which, in turn, caused a pulmonary aneurysm to rupture. (Defs.' 56.1 ¶ 96, Pl.'s 56.1 ¶ 24). Various elements of the police treatment of Clark that contributed to the escalating stress level and likelihood of the ruptured aneurysm included: the officers stopping Clark, isolating him from others, acting aggressively toward him, and physically handling Clark during the attempt to get him to spit out

what they claimed he swallowed. (Pl.'s 56.1 ¶ 25[2]). Clark had a history of heart and lung problems but was not having any particular difficulties during the time period prior to contact with the police. (Pl.'s 56.1 ¶¶ 1, 26).

## ANALYSIS

### *Count I: Liability Under § 1983 – Unreasonable Seizure*

To succeed on a claim under § 1983, a plaintiff must show that: (1) the defendants deprived him of a federal constitutional right and (2) the defendants acted under the color of state law. *Reed v. City of Chicago*, 77 F.3d 1049, 1051 (7th Cir. 1996). As it is undisputed that the Defendants in this case were acting under color of state law, the Plaintiff need only demonstrate that Clark was deprived of a constitutional right protected under the Fourth Amendment (or in Count II, Fourteenth) for Section 1983 liability to attach. Similarly, in order for the Defendants to succeed on their motion for summary judgment, they need only prove that there is no genuine issue of material fact as to the alleged Fourth and Fourteenth Amendment violations.

In Count I of the complaint, Plaintiff alleges that he was seized in violation of his Fourth Amendment rights. Violations under the Fourth Amendment are analyzed under a two-part test. First, in order for Fourth Amendment rights to attach, the person needs to be "seized" within the meaning of the Fourth Amendment. *United States v. Drayton*, 536 U.S. 194 (2002) (*"Drayton"*). Without a valid seizure, no violation of the Fourth Amendment could occur. Therefore, the first inquiry is whether Clark was "seized" within the meaning of the Fourth Amendment.

---

[2] This fact, too, was not disputed by the Defendants in response to the Plaintiff's 56.1 statement of material facts, although they argue a position to the contrary in their briefs.

Under the "traditional rule," a seizure does not occur so long as "a reasonable person would feel free to disregard the police and go about his business." *Drayton*, 536 U.S. at 201. This is a "fact laden" inquiry. In determining if a seizure occurred, courts are to look at many factors, including, for example, whether there was "the threatening presence of several officers . . . whether the suspect was informed that he was free to leave, whether there was physical touching . . . ." *Leaf v. Shelnutt*, 400 F.3d 1070, 1089-90 (7th Cir. 2005).

There is a dispute about how Clark and the other individuals were stopped, about whether Clark was grabbed by Officer Golden, and whether Clark was pushed up against the car. In total, these issues, when viewed in the light most favorable to the non-moving party, raise a material issue of genuine fact, which is properly submitted to a trier of fact. Therefore, this Court will assume, for purposes of this motion, that a seizure occurred.

The second inquiry is whether the seizure was lawful under the Fourth Amendment's "reasonableness" inquiry. The Fourth Amendment requires a level of objective justification for making a stop. *United States v. Sokolow*, 490 U.S. 1, 7 (1989). In order to make an investigatory stop, a police officer must be able to reasonably conclude, based upon observable facts, that criminal activity may be afoot. *Terry v. Ohio*, 392 U.S. 1, 30 (1968). The reasonableness inquiry under the Fourth Amendment is a balancing test, in which this Court has to look at the "gravity of the public concerns served by the seizure, the degree to which the seizure advances the public interest, and the severity of the interference with individual liberty." *Illinois v. Lidster*, 540 U.S. 419, 426-27 (2004).

The Defendants argue that there was a strong public interest served by stopping Clark, in that he was stopped for purposes of:

> [I]nformation gathering about the Gangster Disciples, one of the more notorious and well-known gangs, with tentacles reaching throughout Cook County and the collar counties. There had been a threat of violence at this particular location weeks earlier, and the purpose of Golden's presence and inquiry was to deter violence and gather some information, comparable to the public interests and concerns at issue in *Lidster*.

(Def's Motion for SJ at 8). However, viewing the facts in favor of the non-moving party, the factual basis for many of the reasons raised by the Defendants are, for the most part, in dispute. It is disputed whether there had been a threat of violence at Famous Freddie's; also, the purpose of Officer Golden's special police detail is in dispute. The only reason for stopping Clark that is not in dispute is "information gathering" about the Gangster Disciples. As the Defendants acknowledge in their briefs, alleged gang affiliation, standing alone, may not be enough to justify a *Terry* stop, though it is a "permissible component of the articulable suspicion required for a *Terry* stop," citing *United States v. Feliciano*, 45 F.3d 1070, 1074 (7th Cir. 1995). Here, there are no additional factors for the stop other than a computer entry of Clark's possible gang affiliation. Therefore, this is a genuine issue for the trier of fact; and summary judgment is not appropriate.

This Court need not reach the issue of whether the force applied in the course of the stop was unreasonable and excessive, as wrongful seizure alone could constitute an unreasonable and, therefore, unconstitutional seizure.

For the aforementioned reasons, Defendants' Motion for Summary Judgment as to Count I is denied. The question of qualified immunity of the individual Defendants is addressed below.

### Count II: Liability Under § 1983 – Due Process

The Due Process Clause applies to arrestees and protects them from the "deliberate indifference" of officials. *Frake v. City of Chicago*, 210 F.3d 779, 781 (7th Cir. 2000). In order to establish a due process violation of this kind, a plaintiff must show that the defendants were deliberately indifferent to his serious medical needs. *Jackson v. Illinois Medi-Car, Inc.*, 300 F.3d 760, 764 (7th Cir. 2002) (*"Jackson"*). Negligence is insufficient, and there must be an intent to inflict injury, or conduct so dangerous that the deliberate nature of the defendants' actions can be inferred. *Jackson*, 300 F.3d at 765.

Many of the actions of the individual Defendants are in dispute. Particularly relevant here are exactly how long it took for the Officers to call the paramedics, whether, and at what point, Officer Golden used force against Clark, and, specifically, how the officers were alerted to Clark's condition. Collectively, these raise genuine issues of material fact as to alleged deliberate indifference. Defendants' Motion for Summary Judgment with respect to Count II is denied.

### Counts III-IV: State Law Claim – Wrongful Death and Survival

Counts III and IV are Plaintiff's pendant state law claims. To maintain an action under state law, a plaintiff must show that his restraint was "unreasonable." *See e.g., Martel Enterprises v. City of Chicago*, 223 Ill. App. 3d 1028, 1034 (1991). Therefore, if the Defendants did not violate the constitutional rights of Clark, they cannot be liable under state law.

The Seventh Circuit has explained that principles of legal causation apply to constitutional torts just as they apply to common law torts. *Jones v. City of Chicago*, 856 F.2d 985, 993 (7th Cir. 1988). "Proof of a causal relationship between a defendant's action and a plaintiff's injury is essential in every tort '[b]ecause the consequences of an act go endlessly forward in time and its causes stretch back to the dawn of human history.' Thus, the concept of proximate cause was developed to limit the liability of a wrongdoer to only those harms with a reasonable connection to the wrongdoers actions." *County of Cook v. Philip Moris, Inc.*, 353 Ill. App. 3d 55, 59 (1st Dist. 2004). Under the common law, in order to establish that a defendant is liable for an injury, a plaintiff must prove both legal causation and cause in fact. *Abrams v. City of Chicago*, 211 Ill.2d 251, 258 (Ill. 2004) ("*Abrams*"). Conduct is the cause in fact of an injury only if the conduct is a material element and a substantial factor in the injury. *Abrams*, 211 Ill.2d at 258. Legal cause, on the other hand, concerns a question of forseeability, where the relevant inquiry is whether the injury "is of a type that a reasonable person would see as a likely result of his or her conduct." *Abrams*, 211 Ill.2d at 258.

Usually, proximate cause is a question of fact; however, "the law of proximate cause may be determined by the court as a matter of law where the facts alleged do not sufficiently demonstrate both cause in fact and legal fact." *City of Chicago v. Beretta USA Corp.*, 213 Ill.2d 351, 395-96 (Ill. 2004). The Defendants assert that they could not have foreseen that their actions would have led to the death of Clark, noting that they:

> [S]imply pulled him aside to ask him some questions, did not search him, did not handcuff him, did not 'man handle' him, nor did they do anything else which would lead a reasonably objective person to foresee that the plaintiff would suffer a ruptured aneurysm. It was an interaction that police officers across the nation conduct thousands of times on a daily basis. The fact that the same type of

11

interaction happens regularly without people commonly suffering heart attacks [sic] reinforces the conclusion that Clark's reaction was not foreseeable.

(Def's Motion for SJ at 14).

However, as the Plaintiff argues, if causation and liability are established, the tortfeasor takes his victim as he finds him and is liable for the full extent of the injury caused, even if unforeseen. *Colonial Inn Motor Lodge v. Gay*, 288 Ill. App. 3d 32, 45 (2d Dist. 1997).

It is undisputed that Clark died as a result of a ruptured aneurysm. It is also undisputed that the stress of the confrontation between the officers and Clark caused the adrenaline to flow, which caused the heart to have an increase in inotropic and chronotropic effect. The Defendants argue, however, that unlike the circumstances in the cases cited by Plaintiff, there was no physical injury actually inflicted. However, this is in dispute. According to Manuel's version of events, Officer Golden grabbed Clark by the arm and that he was pulled up against the van.

As a result of these facts, and based on viewing the facts in favor of the non-moving party, Defendants' Motion for Summary Judgment with respect to Count II is denied.

### *Qualified Immunity*

The doctrine of qualified immunity shields public officials who are performing discretionary functions from liability for damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable official would have known. *Hope v. Pelzer*, 536 U.S. 730 (2002). This inquiry must be "undertaken in light of the specific context of the case, not as a broad general proposition" and must be "particularized" based on the facts confronting the officer. *Brosseau v. Haugen*, ___ U.S. ___, 125 S.Ct. 596, 599 (2004).

The first question to be resolved in the analysis of qualified immunity is whether, when taken in the light most favorable to plaintiff, the facts demonstrate that the defendant public official has violated the plaintiff's constitutional rights. *Saucier v. Katz*, 533 U.S. 200, 201 (2001). To make this determination, this Court must decide, as a question of law, if a reasonable officer could have "mistakenly believed that probable cause existed." *Wollin v. Gondert*, 192 F.3d 616, 621 (7th Cir. 1999).

As to the individual Defendants' liability under Count I of the complaint, they submit that "if the actions of Officer Golden, if not correct, were at least 'arguably' correct," and that they should be entitled to qualified immunity. As addressed above, taking the facts in the light most favorable to the Plaintiff, there are factual disputes as to whether a reasonable officer would have known that he could not stop, arrest, or otherwise seize Clark based solely on the computer "gang hit" notation or the shouting and finger pointing that allegedly took place weeks previously at the same location, *United States v. Feliciano*, 45 F.3d 1070, 1074 (7th Cir. 1995), and also, whether there were additional circumstances under which a reasonable officer could have mistakenly believed that there was probable cause to stop Clark.

As the Plaintiff points out, this is a very different situation than the one presented in *Feliciano*. In *Feliciano*, the police were investigating an actual crime and relied upon a witness's identification of the defendant as well as several other circumstances, including the knowledge that the defendant was a gang member who was recently released from prison, as a basis for seizing the defendant. Here, there is no suggestion that Clark was involved in any present or past criminal activity. Further, as mentioned above, there is a dispute as to what the Village of Fox Lake police believed to have occurred at Famous Freddie's in the weeks prior to August 14th.

13

Officer Monksen testified that the earlier gang-related episode consisted of shouting and finger pointing "and that's about it" (Pl.'s Resp. to Defs.' 56.1 ¶ 16); whereas, Officer Golden testified that there was a suggestion of weapons and death threats at Famous Freddie's. (Defs.' 56.1 ¶ 16). The individual Defendants' motion for summary is denied on the basis of qualified immunity.

The analysis under the Fourteenth Amendment depends on the individual Defendants' actions after stopping Clark for purposes of determining qualified immunity. Claims against individuals under Section 1983 require personal involvement in the constitutional deprivation at issue. *Palmer v. Marion County*, 327 F.3d 588, 594 (7th Cir. 2003). The other individual Defendants argue that Officer Golden was the only actor with respect to the events in this regard. However, omissions as well as actions may violate civil rights; and under certain circumstances, a state actor's failure to intervene renders him or her liable under Section 1983. *Yang v. Hardin*, 37 F.3d 282, 285 (7th Cir. 1994). Liability for omissions can be imposed upon officers present at the scene who are aware that a constitutional violation is occurring and who have a "realistic opportunity" to intervene and prevent the violation. *Lanigan v. Village of East Hazelcrest*, 110 F.3d 467, 477 (7th Cir. 1997). It is disputed when and whether Officers Monksen, Bartoszewski, or Daly exited their vehicles; and it is definitely in dispute whether they had a realistic opportunity to intervene and prevent the violation.

Under Illinois law, broader immunity is available for the state law claims (including Plaintiff's Counts III and IV); and police officers acting in the execution or enforcement of the law are entitled to immunity unless their conduct is "willful and wanton." 745 ILCS 10/2-202.

Again, here, there is a genuine question of fact as to whether the actions of the individual Defendants were willful or wanton.

Summary Judgment as to the liability of individual Defendants Golden, Monksen, Bartoszewski, or Daly is denied as to the Section 1983 claims under the Fourth and Fourteenth Amendments and the pendant state law claims on the basis of qualified immunity.

## **CONCLUSION**

For the foregoing reasons, Defendants' Motion for Summary Judgment is denied.

Date: *November 30, 2005*

JOHN W. DARRAH, Judge
United States District Court